```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
ELISEO LUGO, JR.,

                Petitioner,            MEMORANDUM & ORDER
                                       08-CV-1242(JS)
        -against-

ED FURNESS, NEW YORK STATE
DIVISION OF PAROLE,

                Respondent.
----------------------------------X
APPEARANCES:
Petitioner:     Eliseo Lugo, Jr., pro se
                85-11 150 Street
                Briarwood, NY 11435

For Respondent: Kathleen Rice, Esq.
                Laurie Kathleen Gibbons, Esq.
                Nassau County District Attorney's Office
                262 Old Country Road
                Mineola, NY 11501
```

SEYBERT, District Judge:

Petitioner, Eliseo Lugo, Jr. ("Lugo" or "Petitioner"), petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. His Petition raises two constitutional arguments. For the reasons discussed below, the Petition is DENIED.

BACKGROUND

I. Factual Background: Commission of the Crimes and Investigation

On October 7, 2002, Petitioner used a hot, flat object to scald the face of J.G., the fourteen-month-old son of his domestic partner. (T. 267.)[1]

---

[1] Hereinafter T denotes the first trial transcript; T2, the trial transcript of May 27, 2003; and "S" stands for the pages of the sentencing minutes.

Beginning in 2002, J.G. resided at 19 Hope Lane in Hicksville, Nassau County, New York with his stepfather, John Eric Gurian ("Gurian"), and Petitioner, who was Gurian's domestic partner at the time. (T. 185-87.) Despite their relationship with one another, however, Gurian opposed Petitioner's attempts to co-adopt the child. (T. 186, 212.)

Gurian's opposition was not without considerable justification. Before the incidents involved in the criminal case against him, Petitioner had behaved abusively toward J.G., especially at mealtime. Typical were Petitioner's attempts to force-feed J.G., e.g., when the baby manifested an unwillingness to eat any more food, Petitioner would forcefully shovel it into his mouth, and when J.G. spit out the food, Petitioner would tear him out of his high chair, and wantonly hurl him onto his bed. (T. 200-01, 211.) Preventing Gurian from reporting these abuses to the authorities was Petitioner's promise to kill him or anyone else who tried to take J.G. away from him. (T. 201, 228-29.)

At 5:30 p.m. on October 7, 2002, Gurian's next door neighbor heard peals of baby screaming coming from the Gurian residence. The neighbor testified that the screaming sounded as if the baby was in extreme pain. (T. 270.) Before proceeding to the gym, he noted that Petitioner's car was the only one parked at the home. (T. 271.)

Later in the day, around 7:30 p.m., Gurian, sitting in a

2

college class, received a call from Petitioner. Petitioner informed Gurian that J.G. had been injured in an "accident" but that he was now "alright." (T. 190-91.) Petitioner elaborated that J.G., a fourteen-month-old toddler, had leapt from Petitioner's car, grabbed a stick, ran toward the deck in front of Gurian's home, and tripped, sliding across the deck on his face. (T. 190, 192.) Gurian's first question for Petitioner was whether he had called Gurian's mother, a nurse. When asked why he had not done so, Petitioner bizarrely replied that he did not want to and initially refused to call. (T. 191.) Concerned by these comments, Gurian proceeded home immediately.

On arriving, Gurian noticed several unusual things. First, Petitioner was suspiciously peering out of the second-floor bedroom window as Gurian made his way to the front door. (T. 193.) Second, Petitioner uncharacteristically rushed to the door to meet Gurian as he entered. (T. 192.) Finally, entering J.G.'s room, where he was asleep under a blanket, Gurian peeled back the covers to find J.G.'s "gushing and nasty" face and his hair burnt off. (T. 193, 206.) Gurian's mother advised Gurian to let J.G. sleep and to bring him in to the pediatrician the very next morning.

The next day, J.G.'s condition had noticeably declined. One of his eyes partially shut, half of J.G.'s face was swollen and flat. (T. 196.) But because another missed day of class could lead to his being expelled from school, Gurian asked Petitioner to

take J.G. to the doctor, accompanied by Gurian's mother.  (T. 197.)

Dr. Kalenscher examined J.G., who, at this point, had severe burn-like injuries that covered the right side of his face; J.G.'s eye was swollen shut, much of his hair was missing, and some of his hair follicles had been destroyed.  (T. 275, 278.)  When the doctor asked Petitioner what had occurred, he repeated the story he told to Gurian, that J.G. had run away, tripped on a step, and fell face-first onto the deck where he slid.  Dr. Kalenscher expressed his opinion that the injury did not at all look like the kind that would result from a trip and fall.  (T. 277.)  Accordingly, after prescribing an antibiotic for J.G.--J.G.'s wound was now infected--the doctor, suspecting child abuse, insisted that J.G. be brought back the next day.

That night, Gurian asked Petitioner to relate what had happened once more, but the story changed somewhat.  This time, Petitioner claimed to have had his back turned at the time, so that he could not exactly recall how the injury came about.  (T. 198.) After speaking with Gurian about this on October 9, 2002, Dr. Kalenscher reported J.G.'s injury to the Child Protection Services ("CPS") and the police.  (T. 281, 284.)  Informed that the CPS would be involved, Petitioner grew visibly alarmed and angry, threatening to "get even" with the doctor and all who "put him through this."  (T. 200).

On October 9, at the recommendation of a CPS officer who

had examined J.G. at his home, Gurian's mother took J.G. to Winthrop Hospital where he was immediately transferred to the burn unit at Nassau County Medical Center ("NCMC"). A burn-injury specialist, Dr. Han Soo Kim, at NCMC concluded that J.G. had second-degree burns along the right half of his face. (T. 311.) On October 11, Dr. Yasmin Pompeii, a pediatrician and member of the Child Abuse and Neglect Team at NCMC, examined J.G.. She too determined that J.G.'s injury could not have been caused by the slip and fall incident claimed by Petitioner. (T. 321-23, 330.) For one thing, J.G.'s injury was not an abrasion that would result from such an incident, but rather a second-degree burn. Furthermore, if J.G. had fallen, he likely would have injured other parts of his body, but J.G. suffered from no other injuries. (T. 326-27.)

Moreover, Dr. Pompeii found that the burn injury did not appear accidental: had the burn occurred as an accident, the child would have instinctively recoiled from the heat source, leaving burn patterns of differing depths. (T. 327-28.) J.G.'s burn depth was homogenous. (T. 327.) Finally, the edges of J.G.'s facial burns were well delineated, indicating that a hot solid surface (e.g., a frying pan or oven door) had been pressed, and held, on his face. (T. 329, 335.) For this reason, among others, she also ruled out liquid and steam burns. (T. 332.)

Meeting again with a CPS worker, Petitioner suggested

5

that maybe J.G. had burned himself with stick which the child had heated by placing it in Petitioner's car's muffler. (T. 290-91.) Petitioner then blurted out that "if it was hot, spilling water wouldn't it be on the child's hands or running down his neck?" (T. 291.) Asked whether in that case J.G. was burned with hot water, Petitioner retorted "no way." (T. 291.)

Pursuant to Nassau County Indictment No. 120N/03, Petitioner was charged in the County Court of Nassau County with three counts of Assault in the First Degree (New York Penal Law ("NYPL") §§ 120.10[1], [2], [3]), two counts of Assault in the Second Degree (NYPL § 120.05[1], [9]), and Endangering the Welfare of a Child (NYPL § 260.10[1]). At trial, Petitioner testified that on the day of the incident, he picked up J.G. from daycare, returned home, and began preparing dinner by boiling water and rice in a pot on a four-foot cart in the kitchen. (T. 356-59.) He further testified that he set up plastic bottles in the vicinity of the boiling water so that J.G. could play "human bowling ball" in which J.G. hurled himself at the bottles to knock them down. (T. 357, 360, 376.) Petitioner claimed that after he momentarily left the kitchen, he heard a "crash" and a high-pitched scream. (T. 360.) Running into the kitchen, he found J.G. splashed with the boiling water. Id. To explain the wildy diverging account of the accident he had previously related to Gurian and others, Petitioner testified that, while he ordinarily did not lie, he did so on this

occasion lest they think him a bad parent. (T. 385-86.) He denied ever having the conversation about boiling water with the CPS worker. (T. 385-86.)

The jury convicted Petitioner of two counts of Assault in the Second Degree and one count of Endangering the Welfare of a Child, and acquitted him of three counts of Assault in the First Degree. On September 3, 2003, the County Court (Ort, J.) sentenced Petitioner to concurrent terms of imprisonment of five years, as well as three years of post-release supervision for each of the assault convictions, plus one year of imprisonment on the remaining conviction.

In December 2004, Petitioner moved pro se in the County Court of Nassau County to modify his conviction. Though styled as a "Petition For A Writ Of Error Coram Nobis Pursuant to § 1651 Title 28 of U.S.C.A.", the court treated it as an application made pursuant to New York Criminal Procedure Law ("CPL")§ 440.10. Petitioner objected to the conviction on the grounds that: (1) the evidence was insufficient to support his conviction of assault in the second degree; (2) the trial court ought to have submitted assault in the third degree for the jury's consideration as a lesser included offense; (3) the photographs of the victim were unduly prejudicial to Petitioner and ought to have been excluded; (4) the court incorrectly instructed the jury concerning the charge of assault in the second degree under count five; and (5) the

sentence imposed was excessive. In a decision dated January 12, 2005, the County Court denied Petitioner's § 440.10 motion on the ground that it ran afoul of § 440.10(2)(b), Petitioner's claims being based upon matters of the record. Resp. Mem. in Opp., Ex. 3. Petitioner did not seek leave to appeal this decision to the Appellate Division.

In a second post-judgment motion, Petitioner moved on January 19, 2005 to vacate his conviction. Here, he claimed that he was entitled to relief on the ground that he had been denied effective assistance of trial counsel in the following ways: (1) counsel did not present hospital records that would have established that the victim suffered no serious physical injury; (2) counsel failed to familiarize himself with the relevant law and facts; (3) counsel neglected to request that assault in the third degree be submitted to the jury as a lesser included offense; and (4) counsel failed to object to an erroneous charge to the jury concerning the elements of assault in the second degree. See Resp. Mem. in Opp., Ex. 4. On March 3, 2005 the County Court (Ort, J.) denied the motion, stating that there was no reasonable view of the evidence to suggest that the toddler victim's injury, a severe head and facial burn, was not serious and finding that counsel had not been ineffective. See Resp. Mem. in Opp., Ex. 5. Petitioner sought leave to appeal to the Appellate Division, but such leave was denied. See Resp. Mem. in Opp., Exs. 6, 8.

Finally, Petitioner filed a direct appeal. His assigned counsel made the following claims before the Appellate Division: (1) that the trial court erred when it ruled that prior incidents of child abuse could be elicited at trial from the Gurian family (Petitioner did not, however, argue that this alleged violation was of federal constitutional magnitude); and (2) that Petitioner received ineffective assistance of counsel, in that trial counsel lacked insight and was insufficiently prepared. Specifically, Petitioner's counsel argued that trial counsel should not have elicited information from Gurian that Petitioner "continuously" force-fed J.G., and that counsel was unable to elicit from one Maurice Clayton that Petitioner enjoyed a good reputation in the community. Together with his assigned counsel's brief, Petitioner submitted a pro se brief in which he raised the following claims: (1) the trial court charged the jury on the wrong subdivision of assault in the second degree (count five); (2) the People failed to prove serious physical injury suffered by J.G.; (3) sua sponte the trial court should have charged assault in the third degree as a lesser included offense; and (4) trial counsel was ineffective by being unfamiliar with the offense of assault in the second degree, unaware that the court improperly charged the jury, and overzealous in his emphasis of the "intent" element.

On November 28, 2006, the Appellate Division unanimously affirmed the Petitioner's conviction. See People v. Lugo, 34 A.D.

3d 842 (2d Dept. 2006). In particular, the court held that: (1) Petitioner's challenge to the evidence of prior incidents of child abuse (the "Ventimiglia/Molineux"[2] question) was meritless; (2) meaningful representation was provided by trial counsel; and (3) Petitioner's remaining claims were without merit or unpreserved. Id. at 842-43.

Following this decision, Petitioner sought leave to appeal to the New York Court of Appeals. See Resp. Mem. in Opp., Ex. 13. On April 9, 2007, the Court of Appeals denied Petitioner's leave to appeal. See People v. Lugo, 8 N.Y.3d 947 (2007).

Ultimately, on March 19, 2008, Petitioner filed this application for writ of habeas corpus sub judice. He seeks a writ on the following grounds that: (1) the trial court erred in its decision that members of the Gurian family could testify about prior incidents of child abuse; and (2) trial counsel was ineffective.

## DISCUSSION

I. Federal Habeas Review of State Convictions

Petitioner filed this action after the April 24, 1996, effective date of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA's provisions therefore apply to his case. See Williams v. Taylor, 529 U.S. 362, 402, 120 S. Ct.

---

[2] See People v. Ventimiglia, 52 N.Y.2d 350 (1981); People v. Molineux, 168 N.Y. 264 (1901).

1479, 1518, 146 L. Ed. 2d 389 (2000).

Respondent rightly concedes that Petitioner has satisfied the exhaustion requirements of 28 U.S.C. § 2254(b) by directly appealing and collaterally attacking his conviction in the highest state courts. It also rightly concedes that Petitioner's writ is timely, for it was filed within one year of the expiration of the time in which to file a writ of certiorari.

Unless a petitioner can demonstrate both cause and prejudice or a fundamental miscarriage of justice, federal courts may not review state court decisions resting on an "adequate and independent" procedural default rule. Fama v. Commissioner of Correctional Services, 235 F.3d 804, 809 (2d Cir. 2000). In the common circumstance where the state court "uses language such as 'the defendant's contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." Id. at 810.

Section 2254 provides that a habeas corpus application must be denied unless the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This deferential review is

11

applied so long as the "federal claim has been 'adjudicated on the merits' by the state court." Cotto v. Herbert, 331 F.3d 217, 231 (2d Cir. 2003). "A state court adjudicates a petitioner's federal constitutional claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." Norde v. Keane, 294 F.3d 401, 410 (2d Cir. 2002) (internal quotation marks omitted).

"Clearly established federal law 'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005) (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002) (internal quotation marks and alterations omitted)). A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in" a Supreme Court case, or it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." Penry v. Johnson, 532 U.S. 782, 792, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001). A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case[.]" Williams v. Taylor, 529 U.S. 362, 407-08, 120 S. Ct. 1495, 1520, 146 L. Ed. 2d 389 (2000). Accordingly, "a federal habeas court may

12

not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

## II. The Trial Court's Evidentiary Ruling

Petitioner's first claim is that the trial court should not have permitted the Gurians to testify about prior incidents of child abuse because "if these were indeed bad acts of child abuse, why didn't the Gurians file a report as required by the [New York State] law of 'mandated reporters'?" Pet. at 6.

Petitioner's claim stems from the trial court's decision to permit the prosecutor to introduce evidence that Petitioner had abused J.G. in the past. At the outset, the Court notes that, although Respondent rightly concedes that this claim was properly exhausted in state court, some of Petitioner's "supporting facts" here were not adduced in state court in connection with the evidentiary error claim. These include the "facts" that the Gurian family has defaulted in a lawsuit Petitioner has brought against them for failing to report past abuse, and that Gurian is a "mandated reporter" of child abuse who may be civilly liable for failure to report suspected child abuse. See id. To satisfy the exhaustion doctrine, a habeas corpus petitioner must "fairly present" his federal claim to the highest state court. Baldwin v. Reese, 541 U.S. 27, 32 (2004). A claim is "fairly presented" only

13

where the state courts are informed of "both the factual and the legal premises of the claim [asserted] in federal court." Jones v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997) (emphasis added).

In any event, the trial court's ruling was not contrary to, nor an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. See 28 U.S.C. § 2254(d)(1). That is because the Supreme Court has never taken an unambiguous position on whether the admission of prior bad acts evidence in state court--even when introduced to show criminal propensity--violates due process. See Estelle v. McGuire, 502 U.S. 62, 75 n. 5, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991); see also Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008); Jones v. Conway, 442 F. Supp. 2d 113, 131 (S.D.N.Y. 2006). More generally, the admissibility of evidence in state court is wholly a matter of state law and is therefore unreviewable by a federal habeas court absent a showing that the Petitioner's due process rights were so abused as to deprive him of a fundamentally fair trial. See Estelle, 502 U.S. at 67-68. Here, the trial court's decision to admit evidence of uncharged acts of child abuse was based on state law. Moreover, Petitioner has failed to show that the ruling was so egregiously wrong that it deprived him of a fundamentally fair trial.

On an even more basic level, the trial court's evidentiary ruling was not in error. Evidence of a collateral bad

14

act used to establish the absence of mistake or accident has long been recognized as admissible by New York state courts. See, e.g., People v. Molineux, 168 N.Y. 264, 291-93 (1901). This is especially true in cases, such as this one, that concern child abuse: these crimes frequently occur in the opaque privacy of the home, thwarting ordinary investigative efforts. See, e.g., People v. Sims, 110 A.D.2d 214, 221 (2d Dept. 1985).

Accordingly, Petitioner's application may not be granted on this issue.

III. Ineffectiveness of Trial Counsel

Petitioner's second, and final, claim contends that "during the course of the trial, defense counsel exhibited a surprising lack of preparation and insight. Most egregious was the testimony of Maurice Clayton, a character witness, whom counsel was unable to ask the necessary questions to establish that Lugo had a good reputation in the community." Pet. at 7. He adds, however, that "the court finally interjected and posed questions for counsel and drew out the responses being sought." Id. Petitioner also claims that trial counsel's cross-examination of Gurian brought out the unfavorable fact that Petitioner "continuously" force-fed J.G. Id. Finally, trial counsel failed, it is alleged, to notice that the jury was charged with the incorrect subdivision, which does not exist in the penal code. Id.

In Harrington v. Richter, 131 S. Ct. 770, 787 (2011), the

15

Supreme Court clarified the standard for assessing ineffective assistance of counsel claims when § 2254(d)'s deference applies. The Supreme Court noted that, under § 2254(d), "the question is not whether counsel's actions were reasonable" under the familiar Strickland standard for judging ineffective assistance of counsel. Id., 131 S. Ct. at 788. Instead, the "question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. (also noting that "[t]he standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so") (internal quotations omitted). Thus, to prevail on his ineffective assistance of counsel claim, Petitioner must not only show that: (i) his counsel's representation fell short of an objective standard of reasonableness; and (ii) there is a reasonable probability that, but for the trial attorney's erring, the result of the trial would have been different. See Strickland v. Washington, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). He must also show that there is no "reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 131 S. Ct. at 788. Here, Petitioner has failed to show that such a "reasonable argument" exists.

For one thing, Petitioner's trial counsel has submitted a sworn affidavit in which he advises the Court that he "zealously" represented Petitioner by "exercis[ing] my best professional

16

judgment in a manner consistent with [Petitioner's] best interests." See Resp. Mem in Opp., Ex. 15, para. 2.

But, even if the Court disregarded this affidavit, Petitioner offers no evidence or argument that, but for trial counsel's "errors," the outcome of the trial would have been different. Nor does the Court find any in its independent review of the record. Quite the reverse: among other things, trial counsel succeeded in having Petitioner acquitted of the most grave charges--the three counts of assault in the first degree. (T. 605-08.) Additionally, apart from the outcome, trial counsel conducted able cross-examination of the government's witnesses (K. Gurian: T. 248-53; J. Gurian: T. 210-27; Pompeii: T. 335-41, 343-44; Kalenscher: T. 283-84), proactively participated in voir dire of potential jurors (T. 74, 124, 126-27), presented multiple witnesses (Lugo: T. 350-65; Zayas: T2. 431-43; Clayton: T2. 425-29; Adelman: T. 460-70), and requested that the verdict be set aside (S. 19). Further, at sentencing, perhaps swayed by trial counsel's eloquent plea for leniency, the court did not sentence Petitioner to the maximum sentence for his assault-in-the-second-degree charges, despite the fact that Petitioner deliberately scalded the face of a small, defenseless child. (S. 28-29).

As far as the witness Maurice Clayton is concerned, trial counsel managed to elicit from him that Petitioner was, variously, a "nice guy", "peaceful", and "calm" in his interaction with J.G.

17

and Guruan. (T2. 426-29). Accordingly, the Court finds that--not only does a reasonable argument exist that trial counsel acted within Strickland's deferential standard--the record reflects that counsel acted diligently and cogently to represent Petitioner's interests.

Next, the record seriously belies Petitioner's claim that trial counsel erred by eliciting prejudicial testimony from Gurian concerning Petitioner "continuously" force-feeding J.G. What Petitioner fails to acknowledge is that, during Gurian's direct examination, the prosecutor elicited testimony that "any time" J.G. refused to eat, Petitioner force-fed him, (T. 201), and Gurian more broadly testified that Petitioner behaved abusively toward J.G. Petitioner's counsel's reasonable strategy on cross-examination, therefore, was to establish that Gurian's testimony about prior abuse was fabricated. To this end, counsel asked Gurian to furnish specific dates on which force-feedings occurred. (T. 211). To which Gurian retorted that they happened "continuously," which was, in any event, redundant of his direct testimony. Id. So a reasonable argument exists that this line of inquiry not only satisfied Strickland's deferential standard, and, beyond that, was wholly sensible.

Lastly, Petitioner complains that his trial attorney ought to have noticed that the jury was charged with an incorrect subdivision, or, more precisely, that the court's charge did not

18

reflect the precise wording of P.L. § 120.05[9]. This claim fails for two reasons. First, because the court charged the jury with what was set forth in the indictment, which actually made the prosecutor's proof of the crime <u>more</u> burdensome,[3] trial counsel cannot be faulted for declining to object to the court's decision favoring his client. Second, in light of such circumstances, the Court could not possibly rule that, had trial counsel acted differently here, the outcome of the verdict would have been different; such a finding would require the Court to conclude that although the government satisfied a <u>heavier</u> burden of proof than was required of it, had it faced a lighter burden, it likely would have failed. This turns logic on its head. Accordingly, a reasonable argument again exists that Petitioner's trial counsel satisfied <u>Strickland</u>'s deferential standard.

Accordingly, Petitioner's application must be DENIED.

## CONCLUSION

For the reasons stated above, the Court DENIES Petitioner's writ of habeas corpus in its entirety. The Clerk of the Court is directed to mark this matter as CLOSED.

---

[3] The state court's charge with respect to count five of the indictment placed on the prosecutor the additional burdens to prove that the victim suffered <u>serious</u> physical injury (as opposed to mere physical injury), and that the Petitioner not only intended to cause physical injury (as required under P.L. § 120.05[9]), but acted also with an awareness that his conduct created a risk that <u>serious</u> physical injury could occur to the victim – which is not a requirement under P.L. § 120.05[9]. (T. 6.)

Under 28 U.S.C. § 2253(c), a district court may issue a Certificate of Appealability "only upon the substantial showing of the denial of a constitutional right. The petitioner must show that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." <u>Middleton v. Attorneys General</u>, 396 F.3d 207, 209 (2d Cir. 2005) (citations and quotations omitted). Because there can be no debate among reasonable jurists that Petitioner's claims do not entitle him to § 2254 habeas relief, the Court will not issue a Certificate of Appealability.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:   March __31__, 2011
         Central Islip, New York